725 P.2d 736

Burton J. LEWIN and Jackie N. Lewin,
Plaintiffs-Appellees,

v.

MILLER WAGNER & CO., LTD., Leonard Miller and Phyllis Miller, his wife; J. Carl Dornan and Marilyn Dornan, his wife; Carlos E. Wagner and Ann Wagner, his wife; Terry L. Hothem and Sally Hothem, his wife; Defendants-Appellants.

MILLER WAGNER & CO., LTD.,
Counterclaimant,

v.

Burton J. LEWIN, and Jackie N. Lewin, Counterdefendants.

No. 1 CA–CIV 7809.

Court of Appeals of Arizona,
Division 1, Department D.

March 25, 1986.

Reconsideration Denied May 12, 1986.

Review Denied Sept. 16, 1986.

**30**

Winston & Strawn by Arthur P. Greenfield, Clifford J. Roth, Phoenix, for plaintiffs-appellees.

DeConcini, McDonald, Brammer, Yetwin & Lacy, P.C. by Douglas G. Zimmerman, Gary L. Lassen, Phoenix, for defendants-appellants.

## OPINION

JACOBSON, Judge.

This is an appeal from a jury verdict awarding the plaintiffs, Burton J. Lewin and Jackie N. Lewin damages for accountant malpractice regarding their 1980 income taxes.

Burton J. Lewin owned and operated Pioneer Plumbing Supply Co., a wholesale plumbing supply business, for some 30 years. In 1976, Lewin engaged the accounting firm of Miller Wagner & Co., Ltd. to provide accounting and tax planning services for his business and personal financial affairs. The person primarily responsible for providing Lewin with tax advice was Carl Dornan, who had joined the firm in 1979 to head its tax department.

During the latter part of the 1970's, Lewin began planning for his retirement. In May of 1979, Lewin sold Pioneer Plumbing to Amfac Distribution, Inc. The sale was structured as a tax-free exchange of stock whereby Lewin exchanged all of his Pio-neer Plumbing stock for shares of Amfac stock. In September of 1979, Lewin sold approximately half of his Amfac shares to the securities firm of Goldman Sachs & Company on an installment sale basis, which allowed him to receive $16,567 in 1979 and the balance of $1,242,128 in January of 1980.

Lewin wished to dispose of the balance of the Amfac stock, but was concerned with proceeding with a sale that would result in a large tax liability in 1980. He needed to know how he could affect a sale and yet minimize his tax liability.

With these concerns in mind, in February, 1980, Lewin and Dornan began meeting in regard to tax planning for the 1980 tax year. They discussed the differing tax consequences if Lewin sold the other half of the stock on a cash basis versus an installment basis. Lewin attempted to communicate his goal of paying no more than $32,000 in taxes for 1980. This was the amount that was being withheld from his earnings that year. Dornan advised Lewin that he could proceed with a cash sale of the rest of the Amfac stock in 1980 and that his taxes for the year could be decreased through charitable donations, stock option straddles, and investments in oil and gas ventures. Lewin then sold the balance of the Amfac stock in April and May of 1980, receiving $1,295,347 in cash. The capital gains Lewin realized in 1980 from the two stock sales were $1,189,478 from the 1979 installment sale and $1,251,183 from the 1980 cash sale.

Lewin chose to use stock option straddles as the major means of lowering his 1980 taxes.[1] Dornan advised Lewin that if he was going to use the stock option straddles to achieve his tax goals, he needed to acquire $750,000 in straddle losses for 1980. Lewin acquired only $554,000 in such losses, and therefore expected a tax liability of approximately $10,000 to $15,000 more

---

1. A stock option straddle is a transaction by which an investor may generate short term capital losses in one year which are then transferred into short term capital gains in the next year. Straddles postpone tax payment, because the losses generated in the first year offset long term capital gains the investor has that year. The tax is postponed until the subsequent year when the losses are transformed into short term capital gains.

than the originally anticipated $32,000 figure.

On April 13, 1981, two days before the 1980 tax returns were due, Lewin learned from personnel at Miller Wagner that his tax liability would be more than $300,000 above the amount of his withholdings. Lewin was visably shaken by this news and met immediately with Dornan and Miller to discuss his tax liability. According to Lewin, Dornan confessed he had forgotten that Lewin would be subject to the alternative minimum tax [2] which made up $208,838 of Lewin's total tax liability of $333,921 for 1980. Because Lewin believed his tax liability would not be much more than the $32,000 withheld from his earnings, he did not have funds available to pay the taxes. After obtaining an extension from the Internal Revenue Service, Lewin borrowed money to pay $100,000 of the tax liability by April 15.

After leaving the meeting with Dornan and Miller, Lewin went directly to the office of his longtime friend and attorney, Harry Cavanagh, located in the same building. Because Lewin appeared very ashen and disturbed, Cavanagh saw him immediately even though he had no appointment. Among other things, Lewin told Cavanagh that Dornan had admitted forgetting the alternative minimum tax, and that the news that his tax liability was more than $300,000 had caught Lewin totally off guard.

Lewin subsequently retained the accounting firm of Toback & Company to review his tax returns. Howard Kesselman, a certified public accountant with Toback & Company concluded that the return was accurate and that little could be done to reduce the 1980 tax liability since the 1980 tax year had ended.

Lewin filed suit against Miller Wagner, alleging accountant malpractice. At trial, Howard Kesselman and Harold Toback rendered expert testimony that Miller Wagner failed to provide proper advice under the circumstances. They testified that the 1980 Amfac stock sale should have been structured as an installment sale, rather than a cash sale, to attain Lewin's tax goals. Kesselman testified that once the cash sale of the stock took place, over $1,800,000 in stock option straddle losses would have been needed to achieve Lewin's tax goals rather than the $750,000 in losses recommended by Dornan. He testified that the cost of acquiring such a large amount of straddle losses would not have been justified. Kesselman also described the disadvantages in using tax straddles to decrease taxes, because these devices are likely to precipitate an audit and be disallowed by the Internal Revenue Service.

Dornan testified that he had no recollection that Lewin had ever let him know he was expecting to limit his tax liability for 1980 to $32,000. Dornan maintained that he had given Lewin accurate information regarding what his tax liability would be if he sold the stock on a cash basis as compared to a sale on an installment basis. He indicated that Lewin chose on his own to make the cash sale, fully aware of the implications for his 1980 tax liability. He stated that he discussed the stock option straddles and other devices with Lewin merely as means of lowering the tax liability, not as a means of decreasing it to the amount of the withholdings. He also denied forgetting the alternative minimum tax or telling Lewin he had forgotten it. Besides denying any negligence on their part, the defendants also defended on the grounds that Lewin had been contributorily negligent.

Expert witnesses for both parties testified, and Dornan himself admitted, that if he overlooked or forgot the consequences of the alternative minimum tax, his advice fell below the accepted standard of practice for accountants. All experts agreed that if

---

**2.** As explained by the expert witnesses at trial, the alternative minimum tax in effect in 1980 was an additional tax imposed on taxpayers with large capital gains. The capital gains which are excluded from income in figuring the regular income tax are added back to the income along with an item called excess itemized deductions. The alternative minimum tax is then calculated by using the alternative minimum tax rates.

Dornan knew Lewin's tax goal for 1980 was to pay no more than $32,000, the advice to sell on a cash basis fell below the accepted standard of practice. Furthermore, defendants' expert acknowledged that a tax planner has an affirmative obligation to discover his client's tax goal, and that failure to make inquiry in that regard would indicate the tax planner was not acting in a competent manner.

Lewin requested damages in the amount of $399,313.68 consisting of the following kinds of expenses Lewin had incurred: (1) $104,885.71 in interest charges on the money borrowed to pay unexpected taxes; (2) $73,281.00 for stock option straddles which he would not have needed if an installment sale had been used; (3) $44,034.51 in interest incurred due to the stock option straddles; (4) $87,881.61 in additional taxes which would not have been incurred if the installment sale of the stock had been used; (5) $6,047.86 as a penalty for late payment of the taxes; (6) $81,204.00 in anticipated additional taxes because, in Mr. Kesselman's opinion, the Internal Revenue Service agent would disallow the straddles; and (7) $2,000.00 in fees for Mr. Kesselman's assisting in the audit in process because Lewin used stock option straddles.

The defendants filed a counterclaim requesting fees for the services rendered. The unpaid fees totaled $4,450.00. The jury was instructed both on the complaint and the counterclaim.

The jury returned a verdict for the Lewins on their malpractice claim in the amount of $200,000.00. The jury also found that the defendants were entitled to recover on their counterclaim for nonpayment of accounting fees, and awarded them $4,450.00. The trial court also granted Lewin's request for $61,806.10 in attorney's fees.

The defendants appeal from the judgment for the plaintiffs, raising the following issues:

(1) Whether the evidence presented by the Lewins was outside the scope of the pleadings and inadmissible on the issue of damages.

(2) Whether the trial court erred in the admission of prejudicial speculative damage evidence regarding an IRS audit of the 1980 tax return.

(3) Whether the trial court abused its discretion in admitting the hearsay testimony of Harry Cavanagh under the excited utterance exception to the hearsay rule.

(4) Whether the trial court abused its discretion in denying defendants' motion for new trial, where the verdicts rendered by the jury were irreconcilably inconsistent.

(5) Whether the trial court abused its discretion in granting the Lewins' application for attorney's fees pursuant to A.R.S. § 12–341.01 in an action founded solely in tort.

## EVIDENCE OUTSIDE SCOPE OF PLEADINGS

We first consider defendants' argument that the trial court erred in admitting evidence outside the scope of the pleadings. Plaintiffs' case for accountant malpractice was based upon allegations that defendants negligently provided tax accounting advice and services in 1980. Yet plaintiffs were allowed to present evidence at trial that defendants also negligently advised plaintiffs in 1979 regarding the sale of Amfac stock in that year. The entirety of plaintiffs' damage evidence was based upon the assumption that plaintiffs were negligently advised on the transactions occurring in both 1979 and 1980.

Defendants objected both to the admission of evidence relating to improper advice given in 1979 and to the admission of evidence regarding damages arising from the advice given in 1979 and 1980. Defendants argue that neither the complaint, nor the joint pretrial statement, nor the trial memo submitted by Lewin indicated that advice given in 1979 was improper and contributed to plaintiffs' damages. The defendants objected on grounds that admission of this evidence would leave them surprised and unable to prepare. The trial court over-

ruled this objection and allowed the evidence to be admitted, ruling as follows:

The court and counsel have discussed this issue, perhaps not on the record, yesterday, I believe, and the court's opinion was that such matters were certainly relevant, and it would not be improper for Plaintiff to introduce evidence with respect to the tax status of the Plaintiff in the year 1979 as it relates to any damage that is claimed to have occurred with respect to the 1980 return, and that the court views the pretrial statement, and contested issue of facts and law, as dispositive of the question that it necessarily involves consideration of the '79 status of the taxpayer, and for that reason the court rules that the objection be overruled in that regard.

■ In our opinion, the trial court improperly failed to consider the dual purpose for which the plaintiffs attempted to use the 1979 advice. It must be kept in mind that two sales of the Amfac stock were involved. The first occurred in 1979. This sale was to be paid in installments, a portion of the sale price being paid in 1979 and the balance in the sum of $1,189,478 in 1980. The second sale occurred in 1980. The trial court was absolutely correct in holding that the jury was entitled to consider what occurred in the 1979 sale, that is, deferring a portion of that sale to be received in 1980, in determining whether the defendants' advice as to a cash sale of the balance of the Amfac stock in 1980 was below the standard of care. If the plaintiffs' case rested on this premise alone, no error would have occurred. However, plaintiffs were allowed to introduce Exhibit 19 into evidence over defendants' objection. Exhibit 19 was a chart that showed plaintiffs' goal of paying only $32,000 in taxes for 1980 could have been reached, without the use of stock option straddles, if the cash received from both of the sales of Amfac stock had been limited to $675,000. This result would have required the installment sale in 1980 with most of the cash to be received in years following 1980. Additionally, it would have required that the Lewins receive much of the cash from the 1979 installment sale in years after 1980.

The evidence at trial showed, however, that in January of 1980 the Lewins received cash from the 1979 sale in the amount of $1,242,128 of which $1,189,478 represented capital gain. Lewin acquired this amount before defendants met with him in February of 1980 to begin tax planning for that year. Contrary to plaintiffs' argument on appeal, we find no evidence in the record to indicate the 1979 sale could have been restructured to postpone receipt of cash beyond 1980, once the cash had already been received. After plaintiffs received the cash in 1980 from the 1979 installment sale, Lewin's goal of paying only $32,000 in 1980 taxes was not feasible by the means shown in Exhibit 19. The evidence of the Lewins' damages consists of the expenses they incurred because they had not been advised to receive only $675,000 in 1980 from the sales of their Amfac stock. For this evidence to be relevant, Lewin would have to show that both the 1979 and 1980 sales were transacted in accordance with defendants' negligent advice. No evidence was presented to show damages based solely on negligence in 1980.

In our opinion, not only was advice given in 1979 outside the pleadings and pre-trial statement, but any liability predicated upon such advice may well be barred by the statute of limitations. Under these circumstances, we cannot find the admission of Exhibit 19, and damage evidence based thereon, to be harmless error.

### SPECULATIVE DAMAGE EVIDENCE

Next, defendants argue the trial court admitted speculative damage evidence that requires reversal of the judgment. On this issue, we also agree with the defendants and conclude that a remand for new trial is required.

Plaintiffs' expert witness, Mr. Kesselman, testified that the Internal Revenue Service was auditing the 1980 tax return and that this audit was at the agent level at the time of trial. Kesselman was allowed

to testify that the stock option straddle losses would likely be disallowed, at least at the agent level, and that additional tax liability would be assessed against the plaintiffs. He also testified that the additional amount of taxes due if the stock option straddle losses were disallowed, would be $81,204. The defendants included this item in their request for damages. The trial court instructed the jury that if it found the defendants liable to the plaintiffs, it could consider this additional tax liability. Defendants filed a motion *in limine*, objecting to the presentation of evidence regarding the possible disallowance of the straddle losses and to the trial court's damages instruction. Defendants argue that the evidence was purely speculative and therefore inadequate. Lewin argues that the evidence showed these future damages were reasonably likely to occur and that, therefore, sufficient certainty was shown.

Generally, damages that are speculative, remote or uncertain may not form the basis of a judgment. *Coury Bros. Ranches, Inc. v. Ellsworth*, 103 Ariz. 515, 446 P.2d 458 (1968). Moreover, a distinction exists between the quality of proof necessary to establish that damages were sustained and the measure of proof necessary to enable a jury to fix the amount of damages. *Jacob v. Miner*, 67 Ariz. 109, 191 P.2d 734 (1948); *Jacobson v. Laurel Canyon Mining Co.*, 27 Ariz. 546, 234 P. 823 (1925). In *Coury Bros. Ranches, supra*, the Arizona Supreme Court stated that "[p]roof of the fact of damages must be of a higher order than proof of the amount of damages." 103 Ariz. at 521, 446 P.2d at 464. In *Jacob, supra*, the Arizona Supreme Court stated:

> [T]here is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.

67 Ariz. at 116, 191 P.2d at 738 (quoting *Storey Parchment Co. v. Patterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544).

■ In the present case, the Lewins proved with reasonable certainty the amount of damages they would sustain if the Internal Revenue Service disallowed the straddle losses. Despite defendants' arguments to the contrary, we also find sufficient evidence from which the defendants could be found liable for these damages if they were to occur. We find, however, that the fact of the damages occurring was not shown with sufficient certainty to allow the jury to award damages for such a possible future occurrence. We agree there was sufficient evidence that the Internal Revenue Service agent would challenge the straddle losses. However, no evidence was produced to show whether this agent's determination was likely to be upheld either at a higher administrative level or against a legal challenge of the straddle losses. We therefore conclude that the allegation of damage due to disallowance of the straddle losses was completely speculative.

The Lewins' citation to personal injury cases in which future damages are awarded does not assist them. Under those cases, the fact of injury requiring future care must be shown. *See, e.g., Saide v. Stanton*, 135 Ariz. 76, 659 P.2d 35 (1983); *Besch v. Triplett*, 23 Ariz.App. 301, 532 P.2d 876 (1975).

■ The parties in this case requested only general verdicts from the jury. Evidence relating to seven types of expenses make up the damages request. Lewin's request for $81,204 for future damages was included in the overall request for $399,313.68. The jury returned a verdict in the amount of $200,000. We are unable to determine on this record how the jury reached this amount, or that it did not consider the request for future damages in entering its damage award. Nor can we ascertain what portion of the future damages, if any, was included in the award.

Under these circumstances we must reverse the entire judgment and remand the matter for a new trial as to both liability and damages. Retrial on all issues is mandated when the issues are so interwoven that they cannot be separated without injustice to the opposing party. *Anderson v. Muniz*, 21 Ariz.App. 25, 515 P.2d 52 (1973).

## EXCITED UTTERANCE HEARSAY EXCEPTION

Defendants argue that the trial court erred in allowing plaintiffs' witness, Harry Cavanagh, to testify that Lewin told him of Dornan's admission to overlooking the alternative minimum tax. Defendants objected to this testimony in a motion *in limine.* The trial court allowed the testimony under Rule 803(2), Arizona Rules of Evidence, which codifies the excited utterance exception to the hearsay rule. The rule provides: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness: (2) *Excited utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of the excitement caused by the event or condition." For testimony to be admitted under the excited utterance exception, three requirements must be met: (1) there must be a startling event; (2) the words spoken must relate to the startling event; and (3) the words must be spoken so soon after the event that the declarant has no time to fabricate. *State v. Jeffers*, 135 Ariz. 404, 661 P.2d 1105 (1983), *cert. denied*, 46 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983); *State v. Barnes*, 124 Ariz. 586, 606 P.2d 802 (1980).

The trial court is given broad discretion in ruling on evidentiary matters and the rulings will not be disturbed on appeal unless a clear abuse of discretion appears and prejudice results. *Selby v. Savard*, 134 Ariz. 222, 655 P.2d 342 (1982); *Sequoia Manufacturing Co., Inc. v. Halec Construction Co., Inc.*, 117 Ariz. 11, 570 P.2d 782 (App.1977). We find the three-part test was sufficiently met. In this case, Dornan testified that Lewin was visibly shaken after learning, two days before taxes were due, that his tax liability was ten times greater than he had thought it would be. Under the circumstances presented, the trial court could have found that an adequate foundation established Lewin's excited state. The declaration that Dornan had admitted forgetting the alternative minimum tax, related to the startling event. The testimony at trial was that Lewin went directly from his meeting with Dornan to Cavanagh's office, which was in the same building. Cavanagh saw Lewin immediately and noted his distressed state of mind. This evidence satisfies the excited utterance exception. The decision to admit this testimony was within the sound discretion of the trial court. We find no abuse of discretion. We do not reach the issue of irreconcilable verdicts as this issue will not arise upon retrial.

One final matter must be considered. The Lewins were awarded attorney's fees in the trial court and seek attorney's fees on appeal pursuant to A.R.S. § 12–341.01(A), which grants discretion to award such fees in actions "arising out of contract." The question whether that discretion may be exercised in an action for malpractice that emerges from a contract for professional services is one of first impression in Arizona.

There is no doubt that a contract to perform accounting services existed between the parties. There is also no doubt that the law imposes upon the purveyor of such services the duty to perform in accordance with a standard of reasonable care or suffer liability for failure to do so. J. Dooley, *Modern Tort Law*, § 33.17 (Lindahl rev. 1983). The question presented, then, is whether a contract relationship that merely gives rise to a legally imposed standard of care against which subsequent events operate, provides a sufficient nexus between the failure to meet the standard of care and the contract so that it can be said the matter arose out of contract and thus falls within the language of A.R.S. § 12–341.01(A).

The problem would appear to be answered by such cases as *Sato v. Van Denburgh*, 123 Ariz. 225, 599 P.2d 181 (1979). In *Sato* the Arizona Supreme Court was faced with determining which statute of limitations applied to an accountant malpractice action—the statute applicable to torts or the one applicable to contracts. The court stated:

> While some states have held that an action against an accountant for damages as a result of negligent performance of his professional services state [sic] a cause of action for breach of contract, *see L.B. Laboratories, Inc. v. Mitchell*, 39 Cal.2d 56, 244 P.2d 385 (1952), we believe that the essence of a complaint for the negligent performance of professional services by an accountant sounds in tort.

*Id.* at 227, 599 P.2d at 183. As was pointed out in *Sparks v. Republic National Life Insurance Co.*, 132 Ariz. 529, 647 P.2d 1127 (1982) (action for bad faith for refusal of insurance company to pay benefits), however, merely because the action sounds in tort, does not preclude an award of attorney fees under A.R.S. § 12–341.01(A). As stated in *Sparks:*

> It is apparent . . . that attorney's fees may be awarded pursuant to A.R.S. § 12–341.01(A) based upon facts which *show a breach of contract,* the *breach* of which may also *constitute a tort.* The fact that the two legal theories are intertwined does not preclude recovery of attorney's fees under A.R.S. § 12–341.01(A) as long as the cause of action in tort could not exist *but for the breach* of the contract.

*Id.* at 543, 647 P.2d at 1141 (citations omitted) (emphasis added). The question then becomes whether the failure to comport with the legally imposed standard of care also constitutes a breach of the employment contract. *Sato* would seem to indicate not. Other courts that have considered this issue generally agree. As was stated in *Yeager v. Dunnavan*, 26 Wash.2d 559, 174 P.2d 755 (1946):

> . . . where there is a contract for services which places the parties in such a relationship to each other that, in attempting to perform the promised service, a duty imposed by law as a result of the contractual relationship between the parties is violated through an act which incidentally prevents the performance of the contract, then the gravamen of the action is a breach of the legal duty, and not of the contract itself. . . .

*Id.* at 562, 174 P.2d at 757 (quoting *Compton v. Evans*, 200 Wash. 125, 93 P.2d 341 (1939)). *Accord Brueck v. Krings*, 230 Kan. 466, 638 P.2d 904 (1982). *See Equilease Corp. v. State Federal Savings & Loan Association*, 647 F.2d 1069 (10th Cir. 1981) ("where a contract is the mere inducement creating the state of things that furnishes the occasion for the tort, the tort, not the contract, is the basis of the action."); *Pecos & N.T. Ry. Co. v. Amarillo St. Ry. Co.*, 171 S.W. 1103 (Tex.Civ.App. 1914) ("if the transaction . . . [has] its origin in a contract which places the parties in such relation as that in performing . . . the service promised . . . [a] wrong is committed, then the breach of the contract is not the gravamen of the action.") *Jackson v. Central Torpedo Co.*, 246 P. 426 (Okla. 1926) (where defendants negligently "shot" oil well under contract of employment, contract was the "mere inducement" creating the state of things that furnished the occasion for the tort).

■ We therefore conclude that while a contractual relationship may give rise to a duty to perform in accordance with a certain standard of care, this legally imposed duty exists separate and apart from the contract giving rise to the duty. The failure to comply with this standard of care results in a breach of the legal duty imposed and is not an action "arising out of contract" under A.R.S. § 12–341.01(A).

In our opinion, this result is also required on policy grounds. If we were to say that a plaintiff who is successful in a malpractice action is entitled to attorney's fees, then we of necessity must say that the successful defendant in defending that neg-

ligence action is also entitled to attorney's fees. This would run counter to the prevailing American Rule that attorney's fees are not normally awarded in tort actions as to do so has a chilling effect on seeking legal redress for wrongs. *See Restatement (Second) of Torts,* § 914 (1979) S. Speiser, *Attorneys' Fees,* § 12.3 (1973).

Before leaving this subject, we touch briefly upon two Arizona cases which deal with this subject: *ASH, Inc. v. Mesa Unified Sch. District No. 4,* 138 Ariz. 190, 673 P.2d 934 (App.1983) and *Trebilcox v. Brown & Bain, P.A.,* 133 Ariz. 588, 653 P.2d 45 (App.1982). In *ASH* this court held that "As used in A.R.S. § 12–341.01, the words 'arising out of a contract' describe an action in which a *contract was a factor causing the dispute."* *ASH, supra,* at 192, 673 P.2d at 936 (emphasis added). This language was used in the context of an action by an unsuccessful bidder to invalidate a contract between a public body and the successful bidder. As the court noted "it is that contract which prompted the suit." *Id.* at 193, 673 P.2d at 937. Thus, the contract in *ASH* was not merely "a factor", but *the* factor giving rise to the litigation. We therefore do not construe the "factor test" adopted in *ASH* to mean that simply because a contract is peripherally involved in a cause of action, A.R.S. § 12–341.01(A) is always applicable.

In *Trebilcox* we held that the breach of an attorney's fiduciary duty arose out of the implied contractual promise arising from the attorney-client relationship and that, therefore, a claim for A.R.S. § 12–341.01(A) fees was maintainable. In our opinion, this contractual duty, like the contractual duty of good faith dealt with in *Sparks,* arose from the contractual relationship of the parties.

The judgment of the trial court awarding the defendants their fees for services rendered is affirmed. The judgment in favor of the Lewins is reversed and the matter remanded for a new trial.

GRANT, P.J., and SHELLEY, J., concur.