816 P.2d 919

**BRUCE CHURCH, INC., a corporation, Plaintiff–Appellee,**

v.

**UNITED FARM WORKERS OF AMER-ICA, AFL–CIO, a labor organization, Defendant–Appellant.**

No. 1 CA–CV 89–180.

Court of Appeals of Arizona, Division 1, Department B.

Jan. 15, 1991.

Review Denied Oct. 8, 1991.*

See also 160 Ariz. 514, 774 P.2d 818.

---

* Cameron, J., of the Supreme Court, voted to grant both the appellee's petition for review and defendant/appellant's cross petition for review.

**24**

Westover Law Offices by A. James Clark, Yuma, and Golenbock & Barell by Paul J. Goldberg, New York City, for plaintiff-appellee.

Antonio Bustamante, Phoenix, and Lyons, Macri–Ortiz, Schneider, Dunphy & Camacho, P.C. by Dianna Lyons and Chris A. Schneider, Sacramento, Cal., for defendant-appellant.

## OPINION

JACOBSON, Presiding Judge.

In March 1984, plaintiff Bruce Church, Inc. (Bruce Church) brought an action against United Farm Workers of America, AFL–CIO (union) for unfair labor practices in violation of the Arizona Agricultural Employment Relations Act and for tortious interference with business relations. The allegations arose out of a multistate lettuce boycott that the union conducted from 1979 to 1987 against Bruce Church-grown produce. After a 31–day trial, the jury returned a general verdict in favor of Bruce Church, awarding compensatory damages of $4,911,833 and punitive damages of $491,183.

The basic issue on appeal is the geographic scope of the Arizona Agricultural Employment Relations Act, A.R.S. §§ 23–1381 to –1395. Because we conclude that the trial court improperly applied the Arizona statutes to conduct occurring outside this state that was arguably legal in the state in which it occurred, we reverse the judgment on the unfair labor practice claims and remand this matter for a new trial on the remaining tort claim.

### Factual and Procedural Background

Bruce Church, a California corporation authorized to do business in Arizona, is one of the nation's largest lettuce growers. During the time period involved in this suit, it grew sixty percent of its lettuce crop in California and forty percent in Arizona.

The union, a California unincorporated association, is a labor organization representing agricultural employees. Its principal place of business and main offices are located in Keene, California. The union has been the certified exclusive collective bargaining agent in California for Bruce Church employees since 1977. It also represents this company's employees in Arizona, but is not the certified exclusive bargaining agent in this state.

The collective bargaining agreement between Bruce Church and the union expired in 1979. After negotiations toward a new agreement failed, the union engaged in a strike against Bruce Church. A tactic employed by the union in connection with this strike was a multistate boycott against Bruce Church's "Red Coach" brand lettuce.

The boycott took the form of encouraging people not to buy the product itself (a primary boycott), and, in some areas of the country, the boycott also took the form of encouraging people not to patronize several grocery chains that sold Bruce Church lettuce (a secondary boycott). The union's boycott activities included picketing, demonstrations, informal leafletting, mailings, press conferences, demonstrations, and meetings in several key cities throughout the United States and Canada. In early 1984, several grocery chains stopped buying Red Coach lettuce, and Bruce Church sales decreased significantly, allegedly as a result of the success of the boycott activities.

On March 21, 1984, Bruce Church filed this action in Yuma County Superior Court, charging the union with the following unfair labor practices in violation of § 23–1385 of the Arizona Agricultural Employment Relations Act:

(1) engaging in a secondary boycott directed at Bruce Church's customers, in violation of A.R.S. § 23–1385(B)(6);

(2) using dishonest, untruthful, and deceptive publicity to induce or encourage the ultimate consumers from purchasing Bruce Church's lettuce, in violation of A.R.S. § 23–1385(B)(8);

(3) imposing illegal economic sanctions against Bruce Church, in violation of A.R.S. § 23–1385(B)(1);

(4) threatening to or engaging in libel and slander to prevent the sale of Bruce Church's lettuce, in violation of A.R.S. § 23–1385(B)(10).

The second count of the complaint alleged that the union tortiously interfered with Bruce Church's business relations with its customers, and sought punitive damages as well as compensatory damages.

The union first challenged this action by contending that its conduct was protected as free speech under the first amendment to the United States Constitution, that the conduct was legal bargaining activity under California labor law, and that none of the activity alleged to be illegal occurred in Arizona. Bruce Church responded that secondary boycott activity was not *per se* constitutionally protected by the first amendment and that California law should not be applied to this Arizona suit. On August 7, 1984, the court denied the union's motion for summary judgment based on these contentions.

On November 30, 1984, the union filed its answer, basically reiterating the arguments previously made and, as affirmative defenses, claimed constitutional and California statutory protection and the bar of the applicable statute of limitations.

Pretrial discovery progressed for several years. In April 1987, the union filed its second motion for summary judgment, again arguing the statute of limitations and the applicability of California law to its activities. Bruce Church responded that, under a choice of law analysis, Arizona law should apply; that, under Arizona law, the union's secondary boycott activity was illegal; and that questions of fact remained regarding the other issues raised by the union's motion. On July 6, 1987, the trial court denied the motion, ruling that Arizona law would apply, that the applicable statute of limitations was one year and that the court would consider excluding statements published prior to that time as each exhibit was argued, and that certain statements would not be considered defamatory as a matter of law.

On February 2, 1988, the matter proceeded to jury trial. As far as secondary boycott activity was concerned, counsel for Bruce Church conceded at time of oral argument in this court that no such activity occurred in Arizona. Our review of the evidence supports this concession, as demonstrated by the trial testimony of Frank Ortiz, a former union vice-president and member of the executive board, and two other members of the executive board of the union, Arturo Mendoza and Oscar Mondragon. All three union officials testified that the union never engaged in secondary boycott activities in Arizona, although the union was aware that its activities would affect the sales of lettuce grown in Arizona as well as in California.

Cesar Chavez, the union's president, testified that, between 1979 and 1984, the

boycott was centered in 15 cities that comprised about 65% of the consumption of most vegetables and fruit, located in New England, California, the midwest, and mid-Atlantic states. After Lucky Stores, a California-based grocery chain, stopped carrying Bruce Church lettuce in January 1984, the boycott expanded to a second phase with mailings directed at customers in Boston, Detroit, Chicago, and New York. Chavez testified that the union never intended for secondary boycott activity to occur in Arizona, and in fact instructed union members not to engage in secondary boycott activity here, because the union was aware that such activity was illegal in Arizona.

The deposition of Reverend Wayne Hartmire, general manager of social marketing for the union, was read to the jury. Rev. Hartmire testified that no secondary picketing occurred in Arizona, although a union support group in Phoenix may have distributed informational leafletting in front of Lucky's outlets as a primary boycott activity. Additionally, Rev. Hartmire later testified at trial, "We had supporters in Phoenix and they wanted to help, but they were also concerned about the law, so they restricted themselves to leafletting regarding Bruce Church lettuce."

At the end of the presentation of evidence, Bruce Church moved for a directed verdict on the ground that the union's activities, including those that occurred outside of Arizona, constituted a secondary boycott in violation of Arizona law. The union orally requested a "counter directed verdict" that it had not conducted a secondary boycott within the state of Arizona. Counsel for the union reviewed the only evidence that Bruce Church had presented of Arizona activities and pointed out that none of those incidents constituted secondary boycott activity. He argued that no illegal conduct therefore had occurred in Arizona and that the Arizona statutes could not constitutionally prohibit conduct outside the state, because, "It must be the acts themselves within the boundaries of the State of Arizona which are prohibited, and none others." Bruce Church responded that Arizona law could prohibit activity that occurred outside its borders because

Arizona lettuce was affected by the boycott. The court rejected the union's position and directed a verdict that the union's activity constituted a secondary boycott in violation of Arizona law. It also rejected the union's contention that damages should be limited to those acts that occurred in Arizona.

The jury was instructed on four theories of recovery. First, the trial court instructed the jury on the issue of secondary boycott, which is a violation of A.R.S. § 23-1385(B)(6), as follows:

> You are instructed that the evidence in this case has established that the defendant was involved in a labor dispute with the plaintiff and *conducted a secondary boycott* which was directed at the plaintiff through various persons or companies which the plaintiff claims were its customers.
>
> *A secondary boycott is a violation of the law, and you should award plaintiff for such violation such sum as you find appropriate* to compensate the plaintiff for its loss, if any, of economic benefits, future as well as past, which the plaintiff would, in all reasonable probability, have gained had it not been for the secondary boycott.
>
> In assessing such damages you may not award damages which you find were suffered prior to March 21, 1983.

(Emphasis added.)

The trial court also instructed the jury that it could compensate Bruce Church if it found any of the following: (1) that the union had "induced, encouraged or coerced customers of the plaintiff to make a management decision not to sell, handle or distribute plaintiff's lettuce or other products," which was based on a violation of A.R.S. § 23-1385(B)(7), a ground that, although not originally alleged in the complaint, apparently was tried by consent of the parties; (2) that the union had, "by the use of dishonest, untruthful and deceptive publicity, induced or encourage[d] the ultimate consumer of plaintiff's lettuce or other products to refrain from purchasing, consuming or using such lettuce or other

products," which was based on a violation of A.R.S. § 23–1385(B)(8); or (3) that the evidence established the elements of tortious interference with Bruce Church's business relationships and business expectancies.

After deliberation, the jury returned a verdict in favor of Bruce Church, awarding compensatory damages of $4,911,833 and punitive damages of $491,183.

The union filed a motion for judgment notwithstanding the verdict or a new trial, raising numerous grounds for relief, the following of which are relevant in this appeal:

(1) the trial court erred in directing a verdict regarding the secondary boycott issue because none of the secondary boycott activity occurred in Arizona;

(2) the jury could not find on the evidence that the union engaged in any activity otherwise constituting an unfair labor practice under the Arizona Agricultural Employment Relations Act because no illegal conduct occurred in Arizona;

(3) because the jury returned a general verdict instead of special verdicts, a new trial is necessitated in that the court cannot determine which claim or claims formed the basis of the jury's verdict in favor of Bruce Church.

The trial court denied the motion and the union appealed.

### Discussion

Although the union presented sixteen issues in its opening brief, several are repetitive and several are not argued. Additionally, we find that because of our disposition on what we consider the threshold issues, we need not address the constitutionality of the Arizona Agricultural Employment Re-

lations Act on first amendment grounds. We therefore address only those issues necessary to our disposition.

### 1. Geographic Scope of the Arizona Act

As the threshold issue, we must decide whether the Arizona Agricultural Employment Relations Act constitutionally can be extended to afford a claim for damages based upon activities that occur outside of Arizona, but that affect produce growing in Arizona, when those activities may be statutorily protected in the state in which they occur.

In this regard, the union first argues that, based upon the policy declaration contained in A.R.S. § 23–1381, the act itself restricts its application to violations "originating in this state." That section provides:

It is the intent of the legislature ... to declare that certain acts are unfair labor practices which are prohibited and subject to control by the police power of this state. The overriding special interest of the state of Arizona with respect to certain *secondary boycott activities originating in this state,* but extending across state lines and directed at employers in other states, must be recognized, and such acts must be made unlawful and subject to control by the police power of this state.

A.R.S. § 23–1381 (emphasis added). Bruce Church counters that this reference to "the police power" of the state means only that conduct must originate in this state in order to be subject to criminal prosecution pursuant to A.R.S. § 23–1392,[1] or to be subject to an administrative remedy imposed by the Arizona Agricultural Employment Relations Board pursuant to A.R.S. § 23–1390,[2] but not when a private injured

1. A.R.S. § 23–1392 provides in part: "Any person ... who violates any provision of this article is guilty of a class 1 misdemeanor. *The provisions of this section shall not apply to any activities carried on outside the state of Arizona."* (Emphasis added.)

2. For example, the board is provided with power to "prevent any person from engaging in any unfair labor practice," A.R.S. § 23–1390(A), by

issuing an order "requiring such person to cease and desist from such unfair labor practice," which may include directing reinstatement of an employee with back pay. A.R.S. § 23–1390(C). Additionally, the board may petition any superior court for enforcement of such an order, for other appropriate temporary relief, or for a restraining order. A.R.S. § 23–1390(E).

party brings an action for damages incurred as a result of the unlawful activity. In the private party damage case, Bruce Church argues, the act does not require the unlawful conduct to have occurred within the state, as made clear by A.R.S. § 23-1393. That section provides:

> Any person who is aggrieved or is injured in his business or property by reason of any violation of this article ... may sue in any superior court having jurisdiction of the parties for recovery of any damages resulting from such unlawful action, *regardless of where such unlawful action occurred and regardless of where such damage occurred....*

A.R.S. § 23-1393(A) (emphasis added). Bruce Church argues that this wide jurisdictional scope is constitutionally justified by the legislature's declared public policy that "the uninterrupted production, packing, processing, transporting, and marketing of agricultural products is vital to the public interest." A.R.S. § 23-1381. Because of that vital interest, Bruce Church contends, it is sufficient to be actionable under A.R.S. § 23-1393 that an unfair labor practice caused an effect on Arizona produce regardless of where the conduct occurred. We disagree.

■ Throughout these proceedings, the union contended that its secondary boycott activities *originated solely in California,* where such activity is allowed under California labor law. Section 1154(d) of the California Labor Code prohibits, as unfair labor practices, some secondary boycott activities similar to those prohibited by the Arizona statute, but that section also allows secondary boycott activity under the following circumstances:

> However, *publicity which includes picketing* and has the effect of requesting the public to cease patronizing such other [secondary] employer, *shall be permitted only if the labor organization is currently certified* as the representative of the primary employer's employees.

Calif.Labor Code § 1154(d) (emphasis added). Thus, many of the union's activities that occurred in California, but which the

trial court instructed the jury constituted illegal secondary boycott activities under Arizona law, were arguably lawful labor practices in California where they occurred.

The trial court mischaracterized this issue as a "choice of law" question, relying on §§ 6 and 145 of the *Restatement (Second) of Conflicts of Law.* Furthermore, the parties on appeal similarly engaged in such mischaracterization. In our opinion, the issue as framed here is not a question of which state's law to apply or whether the court otherwise has personal jurisdiction over the parties. Arizona's attempt under the Agricultural Employment Relations Act to make activity outside the state actionable involves a problem of statutory construction of the geographic range of the statute, which is beyond the scope of the *Restatement* on this question. *See Restatement (Second) of Conflicts of Law,* § 9, comment b (1971).

■ The proper characterization of the application of a state's prohibitions to conduct occurring beyond its borders, as several cases have pointed out, is one of "geographic overbreadth." *See, e.g., Casbah, Inc. v. Thone,* 651 F.2d 551, 564 n. 19 (8th Cir.1981), *cert. denied,* 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 (1982). The rule regarding the allowable scope of a state's regulation of citizens' behavior was long ago stated by the United States Supreme Court:

> Laws have no force of themselves beyond the jurisdiction of the state which enacts them, and can have extraterritorial effect only by the comity of other states. The general rules of international comity upon this subject were well summed up, before the American Revolution, by Chief Justice DeGrey, as reported by Sir William Blackstone: "Crimes are in their nature local, and the jurisdiction of crimes is local. And so as to the rights of real property, the subject being fixed and immovable. But personal injuries are of a transitory nature, and sequuntur forum rei." *Rafael v. Verelst,* 2 W.Bl. 1055, 1058.

The board also has investigatory powers as set forth in A.R.S. § 23-1391.

*Huntington v. Attrill,* 146 U.S. 657, 669, 13 S.Ct. 224, 228, 36 L.Ed. 1123 (1892).

The principle that a state may not regulate conduct in another state that may be legal in that second state has been more recently recognized by the United States Supreme Court. *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). In *Bigelow,* the editor of a Virginia newspaper was convicted of publishing an advertisement for a New York abortion clinic. Virginia law prohibited any publication promoting or encouraging abortions, but abortions were legal under New York law. The editor challenged his conviction on first amendment grounds, and the Court agreed that the advertisement was protected commercial speech to which the statute could not constitutionally apply. The Court also addressed the geographic overbreadth of the statute:

> Moreover, the [abortion] placement services advertised in appellant's newspaper were legally provided in New York at that time. The Virginia Legislature could not have regulated the advertiser's activity in New York, and obviously could not have proscribed the activity in that State. *Huntington v. Attrill,* 146 U.S. 657, 13 S.Ct. 224, 228, 36 L.Ed. 1123 (1892). Neither could Virginia prevent its residents from traveling to New York to obtain those services, or, as the State conceded, ... prosecute them for going there.... Virginia possessed no authority to regulate the services provided in New York.

. . . . .

A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State. It may seek to disseminate information so as to enable its citizens to make better informed decisions when they leave. But it may not, under the guise of exercising internal police powers, bar a citizen of another State from disseminating information about an activity that is legal in that State.

*Bigelow,* 421 U.S. at 822–25, 95 S.Ct. at 2233–34.

Similarly, the Sixth Circuit Court of Appeals struck down as geographically overbroad a city ordinance that prohibited the advertising of drug paraphernalia because it regulated information about the availability of a product that was legally for sale in other locations. *Record Revolution No. 6, Inc. v. City of Parma,* 638 F.2d 916 (6th Cir.1980), *vacated and remanded on other grounds,* 451 U.S. 1013, 101 S.Ct. 2998, 69 L.Ed.2d 384 (1981). The court reasoned:

> [T]he ordinances clearly reach beyond the city limits. The cities can legitimately protect their citizens from the use, sale, or manufacture of "drug paraphernalia" within city limits. However, an impenetrable wall against the free flow of commercial speech cannot be erected around the cities' residents. The cities' interest in regulation of advertising is limited to preventing the sale of drug paraphernalia inside their municipal boundaries. Their legitimate interest does not include regulating the information heard or read by their citizens about the availability of legal "drug paraphernalia" in other locales. *Bigelow v. Virginia,* 421 U.S. at 827, 95 S.Ct. at 2235.

*Record Revolution No. 6,* 638 F.2d at 937.

We recognize that both *Bigelow* and *Record Revolution No. 6* involved attempts by states to regulate extraterritorial conduct by enacting provisions that provide criminal penalties. Here, however, the Arizona legislature has provided a civil cause of action for third parties to recover damages for violation of the act as an additional remedy. *See* A.R.S. § 23–1393. This civil damage action does not involve the state's attempt to criminally prosecute the union for unfair labor practices arising out of conduct occurring outside Arizona or to enjoin it from such extra-territorial activity through administrative remedies. Rather, this is a private cause of action seeking private damages, similar to one sounding in tort.

In this regard, it is well established that a tort claim for personal injuries generally may be brought in any state fo-

rum acquiring personal jurisdiction over the parties and tried according to the law of the state that has the most significant contacts with the parties, regardless of where the conduct occurred. *See generally Restatement (Second) of Conflicts of Laws,* § 9, comment b. However, an action that has its genesis in a state penal statute may be prosecuted only in the state in which the conduct occurred and according to the law of that state. *See Huntington v. Attrill, supra.* We believe the legislature was aware of this distinction when it exempted from criminal prosecution unfair labor practices that are "carried on outside the state of Arizona." A.R.S. § 23–1392. However, by vesting jurisdiction in the superior courts of this state to hear suits for recovery of damages "resulting from such unlawful action, regardless of where such unlawful action occurred and regardless of where such damage occurred," A.R.S. § 23–1393(A), the legislature has attempted to extend its regulatory powers to control conduct in other states by creating an action similar to a tort claim for personal injuries for conduct that occurred wholly outside the state. The flaw in this extension of jurisdiction by A.R.S. § 23–1393 is that a suit for recovery of damages for conduct that occurred elsewhere is statutorily predicated on "unlawful action," defined as "any violation of this article," which includes unfair labor practices made illegal by A.R.S. § 23–1385 that would be subject to criminal prosecution under § 23–1392 had they occurred in this state. Such an action for damages, even if brought by a private party, is essentially penal in nature because it requires as an element of the cause of action a substantive violation of an Arizona penal statute. As such, it cannot be applied to make "unlawful" conduct occurring elsewhere. Therefore, A.R.S. § 23–1393 cannot extend the regulatory power of this state to create an "unlawful action" out of conduct occurring in a state where such conduct may be legal.

Such a geographically overbroad statute may also raise commerce clause problems.[3] State regulations that discourage a multistate entity from doing business in the state because of regulations more burdensome than those imposed in other states are viewed as interfering with interstate commerce. *See* L. Tribe, *American Constitutional Law,* § 6–11 at 338–39 (2d ed. 1988). For example, the United States Supreme Court reasoned that multistate train operators were not only unreasonably burdened by Arizona's requirement of train-length limits that was not imposed in other states, but that the only alternative—that the railroads conform their national conduct to meet compliance with the most restrictive state regulations in the country—was not allowable under the commerce clause because requiring such compliance would impermissibly extend Arizona's regulatory authority beyond its borders. *Southern Pac. Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).

The Supreme Court has also stated:

> The Commerce Clause also precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.... The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, "any attempt 'directly' to assert extra-territorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power."

*Shaffer v. Heitner,* 433 U.S. 186, 197, 97 S.Ct. 2569, 2576, 53 L.Ed.2d 683 (1977). *Edgar v. MITE Corp.,* 457 U.S. 624, 642–43, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982) (holding that an Illinois "blue-sky" law, which directly regulated security transactions that took place across state lines, even if wholly outside the state, had an impermissible sweeping extraterritorial effect and was invalid).

---

**3.** The union does not argue a violation of the commerce clause, art. 1, § 8 of the United States Constitution, in its appellate briefs, although a passing reference to such a violation is made. However, this argument was made before the trial court on several occasions, and the record supports preservation of this issue on appeal. Additionally, counsel touched on this issue at oral argument, so we address it briefly.

We have a duty to interpret a statute, whenever possible, so that its application will be constitutionally sound. In this case, the only possible constitutional construction of the scope of the superior court's jurisdiction under A.R.S. § 23–1393 is to restrict the language of "regardless of where such unlawful action occurred" to the geographical limits of the state of Arizona. We therefore hold that the trial court erroneously directed the jury to base a verdict for unfair labor practices on evidence of boycott activities that occurred in other states.[4] This was reversible error.

Because this claim for damages must be reversed, we will explore, for purposes of retrial, whether any of the evidence of the union's Arizona boycott activities would support a verdict that the union had violated Arizona law by committing an unfair labor practice in this state.

### 2. The Union's Boycott Activities in Arizona

At trial, the only evidence Bruce Church presented as to the union's Arizona boycott activity consisted solely of primary boycott activity, which is lawful conduct not in violation of the prohibition against secondary boycott in A.R.S. § 23–1385(B)(6). Additionally, the record indicates that this same evidence of Arizona activity would not establish an unfair labor practice under the other statutory grounds on which the jury was instructed. Each incident is discussed separately below.

#### a. The Consumer Leaflet

■ Bruce Church introduced Exhibit 213 as evidence of the union's boycott activity in Arizona. That exhibit contained an interoffice memorandum from a supermarket official reporting on the union activity outside its store for the week ending August 1, 1982. However, this established distribution date of August 1982 would put

4. Although this same evidence was admissible as evidence of the tort claim for intentional interference with business relations, the instructions to the jury did not so limit its use.

5. Although the court allowed admission of evidence of activity occurring before that date, it

it outside the one-year statute of limitations on this action, which does not extend prior to March 21, 1983.[5] We therefore cannot find any support in the verdict of a statutory violation of unfair labor practice on any basis from this evidence of Arizona boycott activity.

#### b. Memorandum of Secondary Boycott Activity

■ Bruce Church also introduced, as evidence of the union's Arizona boycott activity, Exhibit 38, an internal union memorandum from David Martinez to the National Executive Board, dated August 12, 1982. That memorandum reads, in relevant part:

—The boycott on Luckys in other states is gradually picking up momentum. Illinois, Florida, Texas and *Arizona* have initiated boycott *(mostly secondary)* picket lines.

(Emphasis added.) Bruce Church argued that the reference to "mostly secondary" and "Arizona" was evidence that the union was conducting secondary boycott picketing against Lucky Stores in this state. This contention, however, was not supported by the evidence. Frank Ortiz testified:

Q. Do you know why Mr. Martinez said "mostly secondary picket lines"?
A. Because we also had primary.

. . . .

Q. And, as a part of receiving this document, ... were those boycott activities discussed at the national executive board?
A. Yes.
Q. And did you discuss whether—at the executive board whether there would be or not be any secondary picketing within the state of Arizona?
A. Yes. We discussed that.
Q. And what was that discussion?

was for the limited purpose of showing a scheme or plan to commit a continuing tort, and to show state of mind for punitive damages. Such evidence does not establish a statutory violation of A.R.S. § 23–1385 within the period of limitations.

A. That in Arizona we could not have secondary boycotts.

Q. And do you know for a fact why Mr. Martinez used the words mostly secondary?

. . . .

A. Because not all the picket lines were secondary boycotts.

Q. And which picket lines were not secondary boycotts?

A. The ones in Arizona.

Ortiz also testified that during this time period he was in charge of the Arizona activities, and that there was "leafletting on the product only, and I made very sure specifically to get that done" by approving the leaflets before they were given out. No other interpretation of "mostly secondary" was given.

Again, like the leaflet, this memorandum is not evidence of secondary boycott activity in Arizona, and does not establish any other statutory violation within the one-year statute of limitations. It therefore also does not constitute evidence that would support a verdict based on a statutory unfair labor practice.

*c. The Preventive Letter*

■ Bruce Church also introduced Exhibit 7, a union letter called "the preventive letter,"[6] signed by Cesar Chavez and mailed to various grocery chains, including several located in Arizona, during March 1984. The letter summarized a 1983 decision by the California Agricultural Labor Relations Board affirming an earlier ruling by an administrative law judge that Bruce Church was "guilty of bad-faith bargaining, a violation of California labor law." The letter concluded:

> In light of these facts, many supermarkets have recently reevaluated their previous decision to buy produce from BCI. It is my sincere hope that [name of store] will not insist on standing by BCI.

Because this activity occurred within the statute of limitations, we consider whether it violated any of the statutory grounds alleged. First, it does not constitute a secondary boycott in violation of A.R.S. § 23–1385(B)(6) because it is aimed at preventing sale of the primary product, not at a boycott of a secondary employer. Second, it does not violate A.R.S. § 23–1385(B)(8) because it does not induce or encourage "the ultimate consumer" to refrain from purchasing the product, but is aimed at the retailer of the product. Third, it does not constitute defamatory publicity prohibited by A.R.S. § 23–1385(B)(10) because it truthfully, although not completely, summarizes the decision of the California Agricultural Labor Relations Board, which was in evidence as Exhibit 285.[7]

■ The remaining question, whether this letter constituted an unfair labor practice in violation of A.R.S. § 23–1385(B)(7), is more difficult. That section provides:

> B. It shall be an unfair labor practice for a labor organization or its agents:
>
> \* \* \* \* \* \*
>
> (7) To induce or encourage or threaten, restrain or [coerce] any secondary employer or any executive or management employee of any secondary employer to make a management decision not to handle, transport, process, pack, sell or distribute any agricultural commodity of an agricultural employer with whom a labor dispute exists.

A.R.S. § 23–1385(B)(7).

The potential for unconstitutional application of such a broad restriction on a union's right to first amendment free speech has been noted by other courts and authorities. *See, e.g., United Farm Workers Nat'l Union v. Babbitt,* 449 F.Supp. 449 (D.Ariz.1978), *reversed on other grounds,* 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), and *vacated,* 442 U.S.

---

**6.** Exhibit 7 also contains two documents entitled "the original letter" and "the spicey letter." However, no evidence was presented that these letters were mailed to Arizona stores, or were sent from Arizona to out-of-state stores, so we do not consider them evidence of Arizona conduct.

**7.** That decision, which also contained a finding that the union had bargained in bad faith, was later annulled by the California Court of Appeal in an unpublished decision in 1986, which was presented to the jury as Exhibit 161.

936, 99 S.Ct. 2872, 61 L.Ed.2d 305 (1979); *see generally* J. Rose, *State Regulation of Agricultural Labor Relations—The Arizona Farm Labor Law—A Constitutional Analysis,* 1973 Law & Soc. Order 373. However, we believe the potential constitutional problem is avoided by reading the prohibition in subsection (B)(7) in conjunction with the qualification on that prohibition contained in subsection (C):

> The expressing of any views, argument, opinion or the making of any statement, including expressions intended to influence the outcome of ... a bargaining controversy, ... or the dissemination of such views, whether in written, printed, graphic, visual or auditory form, if such expression contains no threat of reprisal or force or promise of benefit, shall not constitute or be evidence of an unfair labor practice.... A statement of fact by ... a labor organization ... relating to existing or proposed operations of the employer ... shall not be considered to constitute a threat of reprisal or force or promise of benefit....

A.R.S. § 23–1385(C). This qualification on the prohibition of unfair labor practices in A.R.S. § 23–1385(B) obviously was intended to exclude from the statute those activities constitutionally protected as free speech by the first amendment. *See generally Thornhill v. Alabama,* 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940) (speech-related activities by labor organizations are within realm of protected first amendment activity); *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760,* 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (National Labor Relations Act construed not to prohibit peaceful consumer boycott activity aimed at the primary product); *NLRB v. Servette, Inc.,* 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964) (National Labor Relations Act construed not to prohibit union's request of supermarkets not to handle primary employer's products because no "threat" to engage in unprotected conduct was involved).

In this case, the "preventive letter" constituted an expression of the union's view, in written form, of the primary employer's position in the bargaining controversy, which was, as we have previously noted, substantiated by a decision of the California Agricultural Labor Relations Board that had not yet been reversed, and the letter contained no threat of reprisal or promise of benefit to assure the store's compliance with the union's implicit request not to carry Bruce Church lettuce. As such, under the clear language of subsection (C), it was not an "unfair labor practice."

In summary, we conclude that, as a matter of law, none of the evidence Bruce Church introduced at trial of the union's boycott activities in Arizona either would support a directed verdict that the union had committed a secondary boycott in violation of Arizona law, or would justify instructing the jury regarding the other charged unfair labor practices under A.R.S. § 23–1385(B). The verdict thus cannot be sustained on the basis of evidence of these statutory unfair labor practices.

### 3. The Effect of a General Verdict on the Tort Claim

 We do not address whether the trial court properly instructed the jury on the elements of Bruce Church's claim for intentional interference with business relations, as the union does not raise that issue on appeal.[8] We specifically find that the record contains sufficient evidence to justify an instruction on this tort claim, when all of the multistate conduct of the union is considered. Clearly, this evidence would be admissible for this purpose on retrial.

 We further reject the union's argument that the tortious interference claim should not have gone to the jury because Bruce Church failed to introduce evidence

---

**8.** We further do not decide if the trial court should apply Arizona law or California law to the tort claim, as we perceive no conflict between the laws of these two states with regard to this claim. *Compare Pre-Fit Door, Inc. v. Dor-* *Ways, Inc.,* 13 Ariz.App. 438, 477 P.2d 557 (1970), with *California Beverage & Supply Co. v. Distillers Distrib. Corp.,* 158 Cal.App.2d 758, 323 P.2d 517 (1958).

of the existence of "contracts" with its customers. As Bruce Church has pointed out, both in the trial court and on appeal, the existence of a contract is not an element of a claim for tortious interference with business relations. *See Antwerp Diamond Exch. v. Better Business Bureau*, 130 Ariz. 523, 530, 637 P.2d 733, 740 (1981). We thus find that the union has raised no reversible error regarding the trial court's submission of the tort claim to the jury.[9]

■ However, because the jury rendered a general verdict in this case, we are unable to tell from the record whether the basis of that verdict was Bruce Church's claims of statutory unfair labor practices, which are not supported by the evidence, or Bruce Church's tort claim for interference with business relations. Indeed, even the trial court in ruling on Bruce Church's motion for attorneys' fees was unable to tell which claim formed the basis of the verdict:

> The Court, in this instance, being unable to tell either party with certainty that the jury determined its award based on tortious conduct ..., other secondary boycott activities, or some or all of the above, elects to find that it should not exercise its discretion to award attorney fees to the Plaintiff.

At oral argument in this court, Bruce Church contended that, even if we found the statutory claims were improperly submitted to the jury, we could affirm the general verdict if we found no error regarding the tort claim, relying on *Dunlap v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 666 P.2d 83 (App.1983). In *Dunlap*, the trial court submitted plaintiffs' case to the jury on several theories after denying defendant's request for a directed verdict on each count. On appeal, defendant argued "that judgment n.o.v. should have been granted because the evidence on each count was insufficient to sustain the verdict." *Id.* at 341, 666 P.2d at 85. Division Two of this court, finding evidence "sufficient to sustain the verdict on at least one

count," deemed it "unnecessary to discuss the other counts." *Id.*

We find the circumstances involved in *Dunlap* distinguishable from those in this case. Here, the trial court erroneously directed a verdict on the secondary boycott issue and instructed the jury to assess damages in favor of Bruce Church. Furthermore, the trial court instructed the jury on three other statutory violations that were unsupported as a matter of law by evidence of Arizona conduct. We are unable to ascertain from this record on which ground the jury reached its general verdict, but we know that the jury was presented with several invalid grounds on which to base its award. Under these circumstances, we believe the following approach to the problem is sound:

> Where several issues of fact are tried, and any one of them is erroneously submitted to the jury over the objection of a defendant, and a general verdict is rendered against him, he is entitled to have the verdict set aside and to have a new trial. This is because it is impossible to say whether the verdict was based upon an issue which was properly submitted to the jury or upon an issue which was improperly submitted.

*Roth v. Swanson*, 145 F.2d 262, 269 (8th Cir.1944); *see also Wolf St. Supermarkets, Inc. v. McPartland*, 108 A.D.2d 25, 487 N.Y.S.2d 442 (1985). Indeed, we have previously followed such an approach and remanded for a new trial when a general verdict could have been based in part on speculative evidence. *See Lewin v. Miller Wagner & Co., Ltd.*, 151 Ariz. 29, 725 P.2d 736 (App.1986). In *Lewin*, as here, we found that a new trial "is mandated when the issues are so interwoven that they cannot be separated without injustice to the opposing party." *Id.* at 35, 725 P.2d at 742. We therefore conclude that this matter must be remanded for a new trial solely on the tort claim of interference with business relations, in which the jury must be allowed to consider, if punitive damages are sought, evidence of the alleged legality

---

**9.** The union has not raised as error the failure of the trial court to allow it to present evidence that its boycott activity in California may have

been legal to establish its state of mind or intent for purposes of avoiding or reducing punitive damages.

of the secondary boycott activity conducted in California.

Reversed and remanded for proceedings consistent with this opinion.

EHRLICH and EUBANK, JJ., concur.