**Richard K. COLEMAN and Bobbie J. Coleman, husband and wife, Plaintiffs,**

v.

**Leroy WATTS and Martha Watts, et al., Defendants.**

**No. Civ. 96–667 TUC ACM.**

United States District Court, D. Arizona.

Dec. 24, 1998.

Matthew David Karnas, Michael David Richter, Siegel Bellovin & Karnas, Tucson, AZ, for Richard K. Coleman, Bobbie J. Coleman.

Scott Sterling, Sacks Tierney, P.A., Scottsdale, AZ, for Leroy Watts, Martha Watts.

Charles Kevin Dykstra, Bonnett Fairbourn Friedman & Balint, PC, Phoenix, AZ, for Rosalie E. Butler, Glen W. Horman, Bisbee Realty Inc..

## ORDER

MARQUEZ, Senior District Judge.

This case arises out of the sale of 40 acres of real property located in McNeal, Arizona by Defendants Leroy Watts and Martha Watts ("the Wattses") to Plaintiffs Richard K. Coleman and Bobbie J. Coleman ("the Colemans"). Defendant Bisbee Realty, Inc. through its broker, Defendant Rosalie E. Butler, and its agent, Defendant Glen W. Horman, (collectively "Bisbee") acted as the real estate brokers for both the buyers and the sellers.

The Colemans sue the Wattses for violating the Resource Conservation and Recovery Act, 42 U.S.C. § 6972 ("RCRA") (count one), fraud and intentional misrepresentation (count two), negligence (count three), breach of contract (count five), and breach of warranty (count seven). The Colemans sue Bisbee for fraud and intentional misrepresentation (count two), negligence (count three), negligence per se (count four), and breach of contract (count six). The Colemans seek punitive damages against the Wattses and Bisbee (collectively, "Defendants").

Pending before the Court are Motions for Summary Judgment filed by both Defendants. Summary judgement is available "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Fed.R.Civ.P. Rule 56(c). The party seeking summary judgment carries the burden of showing there is no genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988). Once the moving party has met that burden by presenting evidence which, if uncontradicted, would entitle it to a directed verdict at trial, the burden shifts to the nonmoving party to present specific facts showing that such contradiction is

possible. See Fed.R.Civ.P. 56(e); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 950–52 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979).

In determining whether to grant summary judgment, the court views the facts and inferences from the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 577, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *See Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.1976).

## I. *RCRA against the Wattses–Count One*[1]

The Colemans allege that the property sold to them by the Wattses was and is contaminated by solid and/or hazardous substances as a result of the operations and activities conducted by the Wattses on the property prior to the sale. The Wattses assert that the levels of waste found on the property do not exceed the RCRA regulatory thresholds and are thus, not "hazardous waste."[2] The Colemans ignore the regulatory thresholds and argue in a circular fashion that because there are "recognized environmental conditions" on their property, there is, therefore, a "risk of harm to the public health and environment."

■ To establish a prima facie case under RCRA, a claimant must demonstrate: (1) conditions that may present an imminent and substantial endangerment to health or the environment; (2) that the

endangerment stems from a solid or hazardous waste as defined by the RCRA; and (3) that the defendants have contributed to or are contributing to such handling, storage, treatment, transportation or disposal. *See Foster v. United States,* 922 F.Supp. 642, 660 (D.C.Cir.1996); 42 U.S.C. § 6972(a)(1)(B).

The Court will begin *and end* its inquiry by determining whether the materials in question are "hazardous waste" within the definition of the RCRA. The expert reports submitted by the Colemans establish the following: In September of 1995, the Zenitech Corporation ("Zenitech") prepared the first of two environmental studies. In an effort to collect information about the environmental impact of *past* operations on the property, Zenitech took three samples: a swipe sample from the interior of the house where the Wattses conducted a jewelry making business; a composite soil sample; and a sample from the septic tank.[3] "The results indicated potentially hazardous levels of lead in the soil, potentially hazardous levels of silver in the septic tank, and mercury contamination in all three sampled areas." Zenitech did not, however, make a determinative finding of contamination or hazardous waste and indicated that the analysis showed only the "potential" for hazardous waste.

The second environmental study was prepared by ICON on February 24, 1998. ICON found: (1) no detectable concentrations of cyanide in the three Zenitech samples; (2) metals from inside the house were below Housing and Urban Develop-

---

**1.** The Court will provide citations to the record only when referring to disputed facts.

**2.** In order for a waste to be classified as a "hazardous" waste under the RCRA, it must first qualify as a "solid waste." *See United States v. Self,* 2 F.3d 1071, 1076 (10th Cir. 1993). The RCRA defines a "solid waste" to include any garbage and discarded material from community activities. See 42 U.S.C. § 6903(27). The Wattses do not allege that the materials in question were not "solid wastes" under the RCRA.

**3.** The ICON Consultants USA, Inc. ("ICON") report refers to these same locations as "the metallurgical work shop, the 'slag' adjoining the metallurgical work shop, and the sewage system septic tank," respectively. "Slag" is defined as the "residual byproducts from the metallurgical work ... had been placed in the drive and parking areas immediately surrounding the house."

ment cleanup standards; (3) total metal background concentrations did not exceed Soil Remediation Levels as promulgated by the Arizona Administrative Code; (4) a review of the analytical results from the Zenitech samples indicated the total metal concentrations for the soils containing the "slag" exceeded the Soil Remediation Levels[4] for arsenic and lead in residential soils; and (5) the "Toxicity Characteristic Leaching Procedure (TCLP) for the eight RCRA metals in the soils containing the 'slag' and the septic tank sludge did *not* indicate detectable concentrations exceeding the regulatory thresholds for a characteristic hazardous waste as defined under 40 C.F.R. § 261.24 (emphasis added).[5]"

The RCRA defines "hazardous waste," in relevant part as "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may . . . pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." See 42 U.S.C. § 6903(5)(B).

The RCRA directs the Administrator of the Environmental Protection Agency ("EPA") to develop and promulgate criteria for identifying the characteristics of hazardous waste, and for listing hazardous waste, which should be subject to the provisions of this subchapter, taking into account toxicity, persistence, and degradability in nature, potential for accumulation in tissue, and other related factors such as flammability, corrosiveness, and other hazardous characteristics. See id. at. § 6921(a).

In response to that directive, the EPA developed regulations which specifically list certain materials which are always hazardous if they meet the first two criteria, are "solid" and are "waste." These are listed in 40 C.F.R. §§ 261.30–261.35. Those regulations do not apply in this case.

Other materials may be hazardous if they have one of four characteristics: ignitability (see id. at § 261.21); corrosivity (see id. at § 261.22); reactivity (see id. at § 261.23); and toxicity (see id. at § 261.24). Of relevance to this case is the regulation concerning the characteristic of toxicity. It states:

A solid waste exhibits the characteristic of toxicity if, using the Toxicity Characteristic Leaching Procedure . . . the extract from a representative sample of the waste contains any of the contaminants listed in table 1 at the concentration *equal to or greater than* the respective value given in that table.

(See 40 C.F.R. § 261.24(a) (emphasis added).).

The relevant regulatory levels listed in the table are: 5.0 mg/L for arsenic; 100.0 mg/L for barium; 1.0 mg/L for cadmium; 5.0 mg/L for chromium; 5.0 mg/L for lead; .2 mg/L for mercury; 1.0 mg/L for selenium; 5.0 mg/L for silver. See 40 C.F.R. § 261.24, Table 1, "Maximum Concentration of Contaminants for the Toxicity Characteristic."

The analytical results for the ICON samples in the *slag* were: less than 1 mg/L for arsenic; less than 10 mg/L for Barium; less than .05 mg/L for Cadmium; less than 1 mg/L for Chromium; less than 1 mg/L for Lead; less than .001 mg/L for Mercury; less than .05 mg/L for Selenium; and less than 2 mg/L for Silver. The analytical results for the ICON samples in the *sludge* were identical to those of the slag except that the septic tank sludge apparently contained more arsenic. It contained "less than 15 mg/L for arsenic."

After comparing the regulatory thresholds set forth in the regulations to the

---

4. "Soil Remediation Level" means a pre-determined risk-based standard developed by the Arizona Department of Health Services pursuant to A.R.S. § 49–152(A)(1)(a). See Ariz.Admin.Code R18–7–205(39). The Court fails to see the relevance of the Arizona Soil Remediation Standards to the Coleman's RCRA claim.

5. This should read "40 C.F.R. § 261.24."

samples taken from the Coleman property, ICON concluded, "the Toxicity Characteristic Leaching Procedure (TCLP) for the eight RCRA metals in the soils containing the 'slag' and the septic tank sludge did *not* indicate detectable concentrations exceeding the regulatory thresholds for a characteristic hazardous waste as defined under ... § 261.24." (See ICON Report at 9, ¶ 1, (emphasis added).). "Review of the ICON analytical results indicated TCLP metal concentrations for the sludge and the soils containing the 'slag' were *below* the regulatory thresholds defined for a characteristic hazardous waste (... § 261.24)." (See id. at 10, ¶ 5 (emphasis added).).

In spite of these findings, made by their own expert witness, the Colemans *insist* that "a review of the ICON sample analytical result for the Toxicity Characteristic Leaching Procedure (TCLP) for arsenic in the septic tank sludge at the subject property indicates detectable concentrations that *exceed* the regulatory thresholds for a characteristic hazardous [waste] as defined by 40 C.F.R. § 261 .24." (See Colemans' Combined Response at 4:22–25 (emphasis added).).

■ The Court finds that ICON's conclusion, that the arsenic in the sludge was "less than 15 mg/L," does not meet the characteristic of toxicity under the RCRA. "Less than 15 mg/L," is *not* proof that the concentration for arsenic was "equal to or greater than 5 mg/L." The Colemans have thus, failed to establish the presence of a solid or hazardous waste under 42 U.S.C. § 6972(a)(1)(B).

Having made this finding, the Court need not address whether the Colemans presented evidence of an imminent and substantial endangerment to health or the environment. Nor need the Court reach the issue of whether the Wattses, through their jewelry making business, contributed to or shared in the creation of the alleged hazardous conditions on the Coleman property. Accordingly, the Court will enter judgment as a matter of law in favor of the Wattses on Count One.[6]

## II. State Law Claims

### A. Facts Common to All Counts

Bisbee first became involved with the subject property in December of 1985 when it agreed to list the property for sale on behalf of the estate of Z.T. Hopkins. The listing price was $65,000 and contained the following description of the property:

1. 70 × 14 mobile home with extension and porch plus 40 acres;
2. Mobile home/block construction;
3. Age 1976; and
4. 5 wells...

(See December 27, 1985 listing.).

In 1986, the Wattses asked Bisbee to represent them in purchasing the property. In 1987, the Wattses purchased the property for $47,500. As in the instant case, Bisbee acted as the dual agent for the buyers and sellers in the 1986–87 transaction.

On July 24, 1992, after Mr. Horman inspected property, the Wattses, through Bisbee, listed the property for sale. (See Telephonic Deposition of Martha Watts at 107:16–19). The property was first listed at a price of $249,000 and later lowered to $180,000. The 1992, 1993 and 1994 listings included almost identical descriptions:

1. Small ranch;
2. Block and frame construction;
3. Age 1984;
4. Well water; and
5. If you are looking for a large spacious home (3,340 sq. ft.) with 40 acres in which to raise a garden, horses, and enjoy carefree country living this place is for you. The property is completely fenced.

**6.** Because jurisdiction is also premised upon diversity of citizenship, this Court retains jurisdiction.

There are 5 wells on the property (one with windmill) to give you ample water for a garden, lawn or small pasture. Included in the sale is a 14′ × 64′ mobile home in excellent condition. This would make a good guest house for those winter visitors or a rental unit. There are three septic systems—one with the main house the mobile on another and the third not in use. The main house has to be seen to be appreciated. It has wall to wall carpet or ceramic tile throughout, lots of storage space, and a screened veranda across the front. There is a 1100 sq. ft. wing off the house which the owner is using for his business. This could be used for a rental, mother-in-law's quarters or more bedrooms.

(See July 24, 1992 listing.).

In 1993, the Wattses sent a letter to all real estate agents in the Bisbee area. The letter neglected to state that the main residence was actually an enclosed mobile home and described the water on the property as follows:

There are five wells on this property. The wells are approximately 150 feet deep with water level at 75 feet. The water is good tasting, free of odor, and tests free of impurities.... There are three wells on this parcel. One has a submergible pump but *the other two are idle.* There are two wells on lot # 1, one for the main residence and other outlets on the property.

(See November 12, 1993 letter (emphasis added).).

Advertisements regarding the property were promulgated in newspapers beginning in October of 1994.[7] One such ad, created by Bisbee, described the property as follows:

Mini–Ranch. Spacious home with 3,000–plus square feet on 40 acres. 3 bedrooms, 2½ baths. Fireplace. Beautiful carpet and ceramic tile. Fives wells, one with windmill. Also included is a 14

× 64 mobile home. Two garages, excellent workshop and storage. All fenced. Frontier Road. $180,000 for 40 acres and all improvement[s]. $155,000 for 15 acres and all improvements.

(See newspaper advertisement.).

Although the Wattses and Bisbee knew that three of the wells did not work, neither the listing nor the advertisement contained information about their inoperability. (See Telephonic Deposition of Martha Watts at 148:18–22; 157:24–25; 158:1–6.). Nor did the listing or advertisement contain information about the home being an enclosed mobile home and trailer.

The Colemans, who were living in California at the time, saw the advertisement and contacted Bisbee about the property. On November 1, 1994, the Colemans and Bisbee entered into a Limited Dual Representation Agreement. The Colemans paid the asking price of $180,000.

A formal, professional inspection was never conducted. However, prior to closing, Mr. Watts took Mr. Coleman for a tour of the property in order to investigate its condition. During this examination, Mr. Coleman became aware of solid waste on the property. He saw "piles of scrap" and other "piles of stuff" including a 55–gallon drum, a bunch of three-and-a-half gallon containers, and a pile of wood. (See Deposition of Richard Coleman at 77:9–15; 78:21–24; 81:19–25; 82:1–5.). According to Mr. Coleman, Bisbee (through Mr. Horman) assured him that the waste would be removed. (See id. at 77:12–15.) According to the Zenitech report, the solid waste was not removed.

Prior to the closing, water quality tests were performed on the three non-working wells. Although no E. Coli was present, results showed a minor bacteria problem with the water in one of the wells. Upon receipt of the first test results, Mr. Watts treated the water with a chlorine injection. Mr. Watts informed Bisbee of this problem

---

**7.** The advertisement is undated but the Colemans state that it was published on October 6, 1994. (See Colemans' Combined Response at 10:14–21.).

before the close of the sale, but he did not tell them that he had treated the water. (See Deposition of Leroy Watts at 182:24–25; 183:1–11.). Mr. Horman testified that he never received a report of the test results. (See Deposition of Glen Horman at 29:23–25; 30:1–4 .). The test results were never made known to the Colemans.

In response to a request by the Colemans, Mr. Watts prepared a Real Property Disclosure Statement ("Disclosure Statement") regarding the condition of the property. The Disclosure Statement, which was reviewed by Bisbee,[8] required the disclosure of any problems with heating/cooling systems, plumbing systems, water pressure, drinking water, disconnected or nonfunctional systems, other building, structural or any modification problems, and hazardous materials on the property such as dumps.

The Disclosure Statement indicated only that there was a title problem with the registration of the "original mobile home." In actuality, there were two mobile homes on the property. The Disclosure Statement did not disclose that the main residence was a blocked in mobile home. Nor did the Disclosure Statement reveal that the home included an unheated/uncooled storage area that was actually a blocked in truck trailer, that only some of the wells were working, (i.e. operated in such a way as to produce water), that tests of the water from one of the wells revealed bacteria contamination, and that there were garbage dumps on the property.

The Colemans and the Wattses entered into a Residential Resale Real Estate Purchase Contract and Receipt for Deposit ("Contract") and sale of the property closed on November 21, 1994. Certain warranties survived the closing of the Contract, including that the "[S]eller warrants that he has disclosed to Buyer and Brokers all material latent defects and any information concerning the Premises known to Seller, (excluding opinions of value), which may materially and adversely affect the consideration to be paid by Buyer." (See Contract at 6:325–327.).

B. *Fraud and Intentional Misrepresentation against the Wattses and Bisbee–Count Two*

The Wattses argue that the Colemans' failure to substantiate their RCRA claim necessarily defeats their claim for fraud and misrepresentation. Bisbee adds that the Colemans are unable to prove that Bisbee falsely represented that there were no dumps, landfills, solid waste disposals or easements[9] on the property.[10] The Colemans assert that Defendants committed fraud and misrepresentation during the listing of the property, during the advertisement of the property, and during the execution of the Real Property Disclosure Statement.

█ One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation. See Restatement (Second) of Torts § 525 (1976 Main Vol).

█ The elements of fraudulent concealment were set out in the leading case of *Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458, 462 (1937). They are: (1) the

---

8. Horman admitted reviewing the Disclosure Statement. (See Deposition of Glen W. Horman at 115:20–24.).

9. The Court does not consider the presence of the easement as indicative of fraud and misrepresentation. The Colemans admitted being aware of the easement prior to purchasing the property. (See Deposition of Richard Coleman at 232:17–22.). Additionally, the smelter closed operations in January of 1987.

10. Bisbee concedes that the enclosed mobile home and the inoperability of the wells concern contested issues of fact and are not appropriately disposed of by summary judgment. Because the Wattses concede nothing, the Court will, nonetheless, address those issues.

concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages. *See also Hisel v. Upchurch,* 797 F.Supp. 1509, 1523 (D.Ariz. 1992) (To establish fraud, a party must show, by clear and convincing evidence the following elements: a representation; its falsity; its materiality; the speaker's knowledge of its falsity or ignorance of its truth; his intent that it should be acted on by the person and in the manner reasonably contemplated; the hearer's ignorance of its falsity; his reliance on its truth; and his right to rely thereon.).

■ In the present controversy, the Colemans have carried their burden of establishing all of these elements. In 1985, the subject property was described as a block constructed mobile home with extension, porch, and 5 wells, worth $65,000, and built in 1976. In 1992, the same property was described as a "small ranch" constructed of block and frame, with 5 wells to give "ample water for a garden lawn or small pasture," worth $249,000 (and later, $180,000), and built in 1984. Then, in 1993, it was a "mini-ranch" with "five wells and a windmill." Clearly, a jury must be allowed to decide whether these representations were false and made for the purpose of enticing potential buyers.

■ Defendants attempt to draw a distinction between "a well" and "a well that produces water." "A matter is material if it is one to which a reasonable person would attach importance in determining his choice of action in the transaction in question." *See Lynn v. Taylor,* 7 Kan. App.2d 369, 642 P.2d 131, 134 (1982). When one conveys a false impression by the disclosure of some facts and the concealment of others, such concealment is in effect a "false representation." *See Equitable Life Ins. Co. of Iowa v. Halsey,*

*Stuart & Co.,* 312 U.S. 410, 425, 61 S.Ct. 623, 85 L.Ed. 920 (1941) ("A statement in a business transaction which, while stating the truth so far as it goes, the maker knows or believes to be materially misleading because of his failure to state qualifying matter is a fraudulent misrepresentation.").

In this case, a jury can reasonably find that the inoperability of three of the five wells was a *material* misrepresentation. Additionally, whether equity and good conscience required disclosure of the quality of the water in the wells, the extent of the garbage dumps on the property, and the true nature, construction, and age of the main residence and storage area, are all issues of fact which must be decided by a jury. Accordingly, the Court will deny summary judgment on Count Two.

### C. *Negligence–Count Three*

The rule regarding liability for negligent misrepresentations in business transactions is as follows: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." See Restatement Torts (Second) § 552 (1965 Main Vol.).

Because a claim for relief for negligent misrepresentation is one governed by the principles of the law of negligence, there must be a duty owed and a breach of that duty before one may be charged with the negligent violation of that duty. *See Van Buren v. Pima Community College Dist. Bd.* 113 Ariz. 85, 546 P.2d 821, 823 (1976).

### 1. *Negligence against the Wattses*

The Wattses claim that they did not breach any duty to the Colemans and further that the Colemans cannot claim to have justifiably relied upon their alleged

lack of information since the contested information was know to them and available through their own inspection or through the inspection of a professional. The Colemans assert that the Wattses were negligent in not informing them that the main residence was a blocked in mobile home and that some of the wells were inoperable and contained contaminated water.

A vendor has an affirmative duty to disclose material facts where:

1). Disclosure is necessary to prevent a previous assertion from being a misrepresentation or from being fraudulent or material;

2). Disclosure would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if nondisclosure amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing;

3). Disclosure would correct a mistake of the other party as to the contents or effect of a writing, evidencing or embodying an agreement in whole or in part;

4). The other person is entitled to know the fact because of a relationship of trust and confidence between them.

*See Hill v. Jones,* 151 Ariz. 81, 725 P.2d 1115, 1117 (App.1986), citing Restatement (Second) of Contracts § 161 (1981 Main Vol); Restatement (Second) of Torts § 551 (1977 Main Vol.) (held, there exists a duty to disclose to the buyer the existence of termite damage in a residential dwelling known to the seller, but not to the buyer, which materially affects the value of the property).

The Wattses do not dispute that they owed a duty of care to the Colemans. Instead, they argue that they fulfilled their duty to disclose material facts and that anything not disclosed was within the Coleman's plain view.

■ The Wattses knew that only two of the five wells were operational. Unless the Colemans were informed about the inoper-

ability of the wells, they could have reasonably relied upon the implied representation made in the 1992 listing that all five wells worked and would provide "ample water for a garden, lawn or small pasture." The Wattses had a duty to prevent this previous assertion from being fraudulent by disclosing that only *two* of the five wells provided water.

■ The Wattses contend that the Colemans offer no proof of water contamination. However, Mr. Watts himself stated that he knew there was a "minor bacteria" problem with one of the wells. This *minor* bacteria problem necessitated remedial action. Whether or not disclosure of this problem amounted to a breach of duty is also a question for the jury.

■ Whether the Colemans knew the true nature of the main residence requires a resolution of disputed issues of fact. The Colemans argue that they were not aware that the home was an enclosed mobile home, yet Mr. Watts testified that he disclosed the mobile home issue to Mr. Coleman. (See Deposition of Leroy Watts at 42:7–22.). Further, Betty Lou Coleman (Ms. Coleman's sister) stated that she told Ms. Coleman that the home was an enclosed mobile home prior to the purchase of the property. (See Deposition of Betty Lou Coleman at 12:4–10.).

■ A final dispute arises by virtue of the solid waste on the property and whether the Colemans knew the extent of it. Mr. Coleman testified being aware of some waste, but only that which he was shown by Mr. Watts on the property. It is possible for a jury to find that Mr. Coleman assumed he had seen all the waste on the property.

Viewing the evidence in the light most favorable to the Colemans, which the Court must do, a jury can find that the Wattses were negligent in their representations to the Colemans. Accordingly, the Court will deny summary judgment on Count Three as it relates to the Wattses.

### 2. *Negligence against Bisbee*

With the exception of the enclosed mobile home and the wells, which Bisbee agrees deal with contested issues of fact, Bisbee asserts that because they did not have knowledge of any of the other alleged conditions on the property, they could not have breached a duty to disclose. Bisbee further asserts that they did not have a duty to investigate. The Colemans charge that by virtue of Bisbee's heightened standard of care as professionals and because of their fiduciary duty to the Colemans, Bisbee knew or should have known of the material conditions on the property and so informed them.

■ Real estate salesmen and brokers owe a duty of good faith and loyalty to their principal. They must exercise reasonable due care and diligence to effect a sale to the principal's best advantage. *See Vivian Arnold Realty Co. v. McCormick*, 19 Ariz.App. 289, 506 P.2d 1074, 1078 (1973).

■ A history of Bisbee's involvement with the subject property raises an issue as to whether Bisbee fulfilled their duty of care. In 1985, Bisbee listed the subject property for the Hopkins Estate at a price of $65,000. In 1987, Bisbee represented the Wattses and helped them to purchase the land from the Hopkins Estate for $47,500. This represented a $17,500 *reduction* from the stated listing price. Bisbee represented both the buyer and the seller in the transaction.

In 1992, Bisbee listed the property on behalf of the Wattses for $249,000. This represented a $201,500 *increase* in the value of the property in a period of only five years. Presumably, because no one inquired about the property, the price was dropped to $180,000. During the two years that the property was for sale, only the Colemans offered to purchase it. In 1994, the Colemans purchased the property. Again, Bisbee represented both the buyers and the sellers in the transaction. Bisbee apparently did not negotiate the selling price and the Colemans paid the full asking price of $180,000. This repre-

sented a $132,500 *increase* in the value of the property since the Wattses purchased the property seven years earlier.

The inference to be drawn from Bisbee's dual representation, the conflicting interests of the buyers and sellers, and Bisbee's failure to negotiate the price on behalf of the only interested home buyer, is that Bisbee negligently misrepresented the Colemans by failing to effect the sale to the *Coleman's* best advantage.

■ Additionally, a broker is under a duty to disclose to his client, information which he possesses pertaining to the transaction in question. *See Jennings v. Lee*, 105 Ariz. 167, 461 P.2d 161, 167 (1969). Mr. Horman testified that he reviewed the Disclosure Statement. Arguably, Bisbee was negligent in not verifying the accuracy of the Disclosure Statement before filing it, particularly since Mr. Horman had himself inspected the property.

As to the quality of the water, Mr. Watts testified that he told Bisbee of the bacteria problem with one of the wells before closing. Mr. Horman knew that tests were being conducted but never asked for a copy of the results of the report. It is undisputed that the Colemans were not informed about the bacteria contamination.

Finally, with respect to the solid waste on the property, Mr. Coleman testified that Mr. Horman told him that he would have the garbage on the property removed. Logically, Mr. Horman could not have made an offer to clean up the waste unless he was aware of it. That the property was not cleaned prior to the sale, is further evidence of Bisbee's failure to exercise reasonable due care and diligence. Accordingly, the Court will deny summary judgment on Count Three against Bisbee.

### D. *Negligence Per Se against Bisbee— Count Four*

Bisbee argues that in Arizona, a real estate licensee must disclose only material information that it possesses. There is no

duty to investigate potential problems. The Colemans argue that the same facts that make Bisbee liable for negligent misrepresentation, also make them liable under a theory of negligence per se due to Bisbee's violation of the Real Estate Department Commissioner's Rules.

A person who violates a statute enacted for the protection and safety of the public is guilty of negligence per se. *See Dyer v. Best Pharmacal,* 118 Ariz. 465, 577 P.2d 1084, 1086 (1978). The duties of an Arizona real estate licensee to his client are delineated in Arizona Administrative Code R4–28–1101, "Duties to Client." It reads:

A). A licensee owes a fiduciary duty to his client and shall protect and promote the interests of the client. The licensee shall also deal fairly with all other parties to a transaction.

B). Each licensee participating in a real estate transaction shall disclose to all other parties to the transaction any information which the licensee possesses which materially and adversely affects the consideration to be paid by any party to the transaction, including, but not limited to, the following matters:

1). Any information that the seller or lessor is unable to perform due to defects in title.

2). Any information that the buyer or lessee is, or may be, unable to perform due to insolvency or otherwise.

3). Any material defects existing in any property being transferred.

4). The possible existence of any lien or encumbrance on any property being transferred in connection with the real estate transaction.

The same facts that make Bisbee liable for negligent misrepresentation, also create an issue of fact under Rule R4–28–1101 A and B(2) and (3) of the Real Estate Department Commissioner's Rules. Accordingly, the Court will deny Bisbee's request for summary judgment on Count Four.

## E. Breach of Contract and Breach of Warranty against the Wattses– Counts Five and Seven

The Wattses contend that there is no provision in their Contract with the Colemans requiring them to disclose information that they did not disclose. Additionally, to the extent that the Wattses did breach the Contract, they argue that the breach was not material. The Colemans argue that the Wattses warranted that they had disclosed all material and latent defects concerning the property when in fact they failed to disclose the inoperability of the wells and the true nature of the residence.

In order to prove that there has been a breach of contract count, a plaintiff is required to prove the existence of a contract, its breach, and the resulting damage. *See Clark v. Compania Ganadera de Cananea, S.A.,* 95 Ariz. 90, 387 P.2d 235, 237 (1963). The terms of the contract must be established with sufficient specificity that the obligations involved may be ascertained. *See Savoca Masonry Company, Inc. v. Homes and Son Construction Company, Inc.,* 112 Ariz. 392, 542 P.2d 817, 819 (1975).

The Contract entered into between the Colemans and the Wattses contained a warranty that the seller had disclosed to the buyer all material latent defects as well as *any* information that would materially and adversely affect the consideration to be paid by the buyer. Whether the inoperability of the wells, the quality of the well water, the true nature of the residence, and the extent of solid waste on the property were "material latent defects" or would have affected the price paid by he Colemans, concern disputed issues of fact that must be left for a jury to decide. The Court will deny summary judgment on Counts Five and Seven.

## F. Breach of Contract against Bisbee– Count Six

Bisbee argues that the Coleman's breach of contract claim is really based in

tort not in contract and they cannot recover attorney's fees. The Colemans seek to hold Bisbee liable in contract in order to collect attorneys' fees pursuant to A.R.S. § 12–341.01(A). That section grants to the trial court discretion to award attorneys' fees to the prevailing party in an action "arising out of a contract."

The leading case in this area is *Sparks v. Republic National Life Insurance Co.*, 132 Ariz. 529, 647 P.2d 1127 (Ariz.App. 1982), *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982). In *Sparks*, the plaintiffs successfully brought an action against their insurer claiming breach of contract, bad faith, and misrepresentation. In deciding whether the lower court's award of attorneys' fees was proper, the Arizona Supreme Court had to decide whether the action was one "arising out of a contract." Initially, the *Sparks* court stated that attorney's fees may be awarded "upon facts which show a breach of contract, the breach of which may also constitute a tort." *See id.* at 1141. The fact that the two legal theories are intertwined does not preclude recovery of attorney's fees "as long as the cause of action in tort could not exist but for the breach of the contract ." *See id.*

The court then turned its attention to the question of whether the plaintiff's claims of bad faith and misrepresentation arose out of a contract. Quoting *Noble v. National American Life Ins. Co.*, 128 Ariz. 188, 624 P.2d 866, 868 (1981), the court pointed out that a legal duty was implied in an insurance contract, requiring insurance companies to act in good faith in resolving insureds' claims. With respect to the tort of bad faith, the *Sparks* court stated, "[c]learly, the tort of bad faith cannot be committed absent the existence of an insurance contract and a breach thereof. Because the existence of the tort is intrinsically related to the contract, we conclude that an action alleging insurers bad faith is one 'arising out of a contract' within the meaning of § 12–341.01(A)." *See Sparks*, 647 P.2d at 1142.

With respect to the plaintiff's misrepresentation claim, however, the court noted that the charge was "mainly in tort and its existence does not depend upon a breach of the contract of insurance ." *See id.* The tort "would not involve a breach of the actual contract; therefore, it would not be an action arising from a contract." *See id.*

In a later case, the same court framed the dilemma as follows: "... while a contractual relationship may give rise to a duty to perform in accordance with a certain standard of care, this legally imposed duty exists separate and apart from the contract giving rise to the duty. The failure to comply with this standard of care results in a breach of the legal duty imposed and is not an action 'arising out of contract' under A.R.S. § 12–341.01(A)." *See Lewin v. Miller Wagner & Co.*, 151 Ariz. 29, 725 P.2d 736, 743 (App.1986). In *Lewin*, the court held that attorneys' fees could not be awarded pursuant to A.R.S. § 12–341.01 in a malpractice action brought against an accountant. While the accountant's duty to exercise reasonable care in providing accounting services arose in the context of an accountant-client contractual relationship, the duty did not stem from the contract itself. Instead, it was imposed by law and was independent of the contract.

The Colemans allege that because they entered into a Dual Representation Agreement with Bisbee, Bisbee owed them the duty to exercise the reasonable care and skill of a broker. This meant disclosing all material facts concerning the property including the inoperability of the wells and the true construction of the home. Bisbee allegedly failed to deal with the Coleman's honestly and fairly and thereby breached their contract with the Colemans.

The Coleman's argument is analogous to the tort action for accounting malpractice in *Lewin*. Just as the court found in *Lewin*, the Court herein finds that Bisbee's duty to exercise the reasonable care and skill of a broker was a duty imposed by law and is *independent* of the Limited

957

Dual Representation Agreement. The Colemans' cause of action is based in tort and its existence does not depend upon Bisbee's breach of contract. The Court has no power to award attorney's fees under A.R.S. § 12–341.01(A). Accordingly, the Court will enter summary judgment in favor of Bisbee on Count Six.

### G. *Punitive Damages against both Defendants*

Bisbee asserts that the Coleman's claim for punitive damages fails as a matter of law because they cannot make the requisite showing of an "evil mind." The Colemans allege that summary judgment is inappropriate because a jury could reasonably conclude that both Defendants had actual knowledge about the defects of the property but their greed and desire to sell the property at an inflated price guided their evil hand in pursuing wrongful conduct with the intent of defrauding the Colemans.

Punitive damages are awarded in order to punish the wrongdoer and deter others from emulating the same conduct. The focus of a court's inquiry must be on the wrongdoer's attitude and conduct. *See Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 723 P.2d 675, 679 (1986). In Arizona, the punitive damages standard requires "something more" than gross negligence. *See Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565, 577 (1986). The "something more" is the evil mind, which is satisfied by evidence "that defendant's wrongful conduct was motivated by spite, actual malice, or intent to defraud" or defendant's "conscious and deliberate disregard of the interest and rights of others." *See Gurule v. Illinois Mut. Life and Casualty Co.,* 152 Ariz. 600, 734 P.2d 85, 87 (1987).

Even if the defendant's conduct was not outrageous, a jury may infer evil mind if defendant deliberately continued his actions despite the inevitable or highly probable harm that would follow. *See Delgado v. Heritage Life Insurance Co.,* 157 Cal.App.3d 262, 203 Cal.Rptr. 672, 681–82 (1984) (restrictive policy interpretation coupled with repeated failure to investigate sufficient to infer conscious disregard).

A motion for summary judgment on the issue of punitive damages must be denied if a reasonable jury could find the requisite evil mind by clear and convincing evidence. Conversely, the motion should be granted if no reasonable jury could find the requisite evil mind by clear and convincing evidence. Because in granting or denying such a motion the judge is not a fact finder, the evidence and all reasonable inferences that may be drawn from the evidence should be construed in a light most favorable to the non-moving party. *See Thompson v. Better–Bilt Aluminum Products Co.,* 171 Ariz. 550, 832 P.2d 203, 210 (1992). *See also Newman v. Sun Valley Crushing Co.,* 173 Ariz. 456, 844 P.2d 623, 627 (App.1992), *rev. denied,* 175 Ariz. 272, 855 P.2d 786 (1993) (The question of whether conduct is wilful, wanton, or malicious is almost always a jury question unless the evidence is "slight and inconclusive bordering on the realm of conjecture."). And as with any motion summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Based on a review of all the documents and testimony presented by the parties, the Court finds that there is sufficient evidence in the record to support a jury instruction on punitive damages against both Defendants. Summary judgment is not appropriate on this issue.

Accordingly,

**IT IS ORDERED** that Bisbee's Motion for Partial Summary Judgment (Documents 63 and 74) is GRANTED as to Count 6 and DENIED as to the remaining counts.

IT IS FURTHER ORDERED that the Wattses Motion for Summary Judgment (Document 66) is GRANTED as to Count 1 and DENIED as to the remaining counts.

IT IS FURTHER ORDERED that the Coleman's Request for Oral Argument (Document 90) is DENIED.